## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **SPIWE KANYANGARARA**, <br><br> *Plaintiff*, <br><br> v. <br><br> **STEP BY STEP, INC., et al.**, <br><br> *Defendants.* | **Case No. 2:22-cv-02264-JDW** |

## <u>MEMORANDUM</u>

For good or for bad, there's often no record of what's said in a telephone call. If what's said has legal significance, that lack of evidence can lead to lawsuits like this one. Step By Step, Inc. ("SxS") claims that Spiwe Kanyangarara resigned on a phone call with her supervisor, and Ms. Kanyangarara says otherwise and that SxS railroaded her out of her job. If that were the only dispute, it would be one for a jury. But Ms. Kanyangarara has no evidence that SxS did what it did for discriminatory or retaliatory reasons, nor does she have evidence that SxS deprived her of rights under the Family and Medical Leave Act ("FMLA"). Given that absence of proof, I'll grant summary judgment on most of Ms. Kanyangarara's claims. There are some state law claims that I will not reach, however. Ms. Kanyangarara will have to pursue those claims in state court.

## I.    BACKGROUND

### A.    Ms. Kanyangarara's Employment History At SxS

SxS is a non-profit organization that operates group homes and provides community support services to people with various intellectual and physical disabilities. On January 18, 2017, SxS hired Ms. Kanyangarara, a Black woman who was born in Africa, for the role of Direct Support Staff. SxS promoted her to Life Skills Manager ("LSM") in February 2018. As an LSM, Ms. Kanyangarara oversaw three group homes in Montgomery County. Her job responsibilities included ensuring that the homes complied with state licensing requirements, staff scheduling, overseeing residents' medical appointments, and completing documentation about the homes and residents. She also oversaw staff, financial matters, maintenance, and the daily care of the residents at her assigned homes.

From February 2108 until August 2020, Ms. Kanyangarara reported to SxS's Assistant Director Of Development Disabilities, Marcy Ruyak. In addition to Ms. Kanyangarara, Ms. Ruyak, a White woman, managed three other LSMs in Montgomery County: Stephanie Schucker; Rebecca Harris; and John McCabe. Ms. Schucker, a defendant in this case, and Mr. McCabe are both White. Ms. Harris is Black.

In 2019, the Montgomery County LSMs took on extra home assignments because another manager went on family medical leave. Ms. Kanyangarara's new assignment was on Circle Drive in Collegeville, Pennsylvania. The Circle Drive home was old and in disrepair. The prior LSM had neglected paperwork and the home was not in compliance

with licensing requirements. Additionally, the home's three residents were confined to wheelchairs and behind on medical appointments. Mr. Kanyangarara complained to her superiors about the difficulty of the assignment.

Ms. Kanyangarara also complained to Michelle Harden, SxS's Director Of Development Disabilities, that she overheard Ms. Ruyak saying she believed the Black LSMs didn't understand their job and performed poorly. Ms. Harden investigated and found that Ms. Kanyangarara misheard Ms. Ruyak. She concluded that Ms. Ruyak's comment pertained to all the LSMs, including the White ones, because they were all were behind on paperwork. Ms. Harden filed a report regarding her findings.

On November 27, 2019, Ms. Ruyak issued formal disciplinary actions to all Montgomery County LSMs for missed paperwork deadlines. On December 11, 2019, Ms. Kanyangarara wrote to Ms. Harden to dispute the disciplinary action she received. In her complaint, she argued that all her assignments were behind on paperwork when she took over and that nobody helped her catch them up while she maintained her other responsibilities. Ms. Kanyangarara noted the addition of the Circle Drive house further bogged down her efforts to catch up, and she expressed dismay that nobody helped her. Ms. Kanyangarara wrote that she felt abandoned by management. She did not mention race, discrimination, or whether she felt SxS treated other LSMs better.

In early 2020, SxS reassigned the Circle Drive Home to Ms. Schucker. Ms. Kanyangarara wasn't consulted or notified of the reassignment. She found out about it

after a staff member at the home called her to ask why Ms. Schucker took over. According to SxS, the Circle Drive home was to be relocated to Pottstown, where Ms. Schucker managed other homes. Ms. Kanyangarara didn't manage any homes in Pottstown, so it made more sense to transfer it to Ms. Schucker. Ms. Kanyangarara never complained to SxS about the reassignment.

Ms. Ruyak left SxS in August 2020, and Ms. Schucker took over her position. At that point, Ms. Schucker became Ms. Kanyangarara's supervisor.

### B.    The COVID-19 Test Incident

The outbreak of the COVID-19 pandemic in March 2020 forced SxS to formulate protocols for its staff to operate in a safe environment that limited employee and resident exposures. The organization's leadership decided that managers couldn't work from home because they were essential workers. Instead, only the Director, Assistant Directors, and office personnel would work from the Montgomery County office, and LSMs were assigned a specific group home from which to work on a daily basis.

Additionally, if a resident was exposed to or tested positive for COVID-19, all individuals living or working in the home were treated as if they had tested positive. That meant all residents isolated in their bedrooms. Staff could isolate in the group home as well, but they had the option to isolate in hotels or at home so long as they called out of work. Due to the scarcity of COVID-19 tests, SxS instructed staff only to test residents who

were symptomatic, because a positive test meant asymptomatic residents would isolate in their rooms regardless.

On August 19, 2020, Ms. Kanyangarara texted Ms. Schucker that a staff member at one of her homes tested positive for COVID-19 and that she was taking two residents in for testing. At the time, Ms. Schucker was sitting with Defendant Christine Coughenour, SxS's Vice Present Of Operations, who instructed Ms. Schucker to respond that Ms. Kanyangarara shouldn't test those residents. Ms. Kanyangarara responded that both residents were symptomatic and asked why she shouldn't take them for testing. After that, Ms. Schucker agreed that she could take them for testing, but that Ms. Kanyangarara must attend a Zoom meeting later that afternoon. Ms. Kanyangarara confirmed she'd attend the meeting, and in her frustration stated that she had "a good mind to quarantine at home for 14 days and not deal with this shit!!!!" (ECF No. 26-2 at ¶ 82.)

Ms. Kanyangarara took a COVID-19 test along with her residents. The clinic, Tower Health, instructed her to isolate at home for two days while awaiting her results. Ms. Kanyangarara claims that when she attended the Zoom meeting that afternoon, she mentioned that she would work from home for two days based on those instructions. She also claims she informed Ms. Schucker via text message that she would work from home based on the instructions from Tower Health.

It's undisputed that Ms. Kanyangarara worked from home on August 20, 2020. At some point, another staff member reported a positive COVID-19 test and called out of

her 3:00 p.m. shift. Ms. Kanyangarara decided to drive to the home and work from the parking lot to cover for the sick employee. Ms. Schucker discovered Ms. Kanyangarara worked from home that day when, at Ms. Coughenour's direction, she called Ms. Kanyangarara to instruct her that all staff at the home should test for COVID-19, and Ms. Kanyangarara told her she wasn't at the home but was on her way. Later, Ms. Schucker called Ms. Kanyangarara to remind her that LSMs were required to work from their assigned homes. She suspended Ms. Kanyangarara for working from home that day.

What happened next is disputed and is the crux of this litigation. According to Ms. Schucker, Ms. Kanyangarara was upset about her suspension and resigned over the phone. Ms. Kanyangarara says she did no such thing. A flurry of emails between Ms. Kanyangarara, Ms. Coughenour, and other SxS management show that Ms. Kanyangarara insisted she didn't resign over the phone but that SxS management was convinced that she did. By the time Ms. Kanyangarara protested, SxS management had processed the resignation and claimed it was too late to undo it. Given this dispute, for purposes of this Motion, I assume that Ms. Kanyangarara did not resign but that SxS terminated her employment. Ms. Kanyangarara believes Ms. Schucker and Ms. Coughenour lied about her resignation in retaliation for taking two of her residents for COVID-19 tests.

Whether she resigned or not, Ms. Kanyangarara's employment with SxS ended. She returned her company equipment, including her phone, but first she sent herself

screenshots of text messages and emails that she thought might be relevant to any future litigation.

### C.   Procedural History

Following her departure from SxS, Ms. Kanyangarara engaged counsel. On September 29, 2020, Ms. Kanyangarara's counsel wrote to Edith Hennenbaul, SxS's Vice President Of Human Resources, to inform her that Ms. Kanyangarara intended to pursue retaliation and racial discrimination claims against SxS. In the letter, Ms. Kanyangarara's counsel demanded SxS take steps to preserve documents and Electronically Stored Information ("ESI") that might be relevant to her employment and departure from the company.

Ms. Kanyangarara filed a Charge Of Discrimination with the Pennsylvania Human Relations Commission ("PHRC") and Equal Employment Opportunity Commission ("EEOC") for racial, national origin, and disability discrimination,[1] as well as retaliation, on February 20, 2021. She filed her Complaint in this case on June 8, 2022. She asserts claims for racial discrimination,[2] retaliation, and a hostile work environment, based on Title VII of the Civil Rights Act, 42 U.S.C. § 1981, and the Pennsylvania Human Relations Act.

---

[1] Ms. Kanyangarara's Complaint asserted claims for disability discrimination under the Americans With Disabilities Act and the Pennsylvania Human Relations Act, but she has since dropped them, so I won't address them.

[2] Although the Defendants were unsure whether Ms. Kanyangarara was also pursuing claims for national origin discrimination, Ms. Kanyangarara confirmed that she isn't in her Response to the Defendants' Motion.

Ms. Kanyangarara served discovery requests, including requests for production, on November 3, 2022. Defendants responded and produced responsive documents on December 13, 2022. On January 18, 2023, the Defendants sought an extension of the January 24, 2023, discovery deadline because Ms. Kanyangarara hadn't responded to their discovery requests. Judge Robreno extended the discovery deadline to February 24, 2023. Defendants took Ms. Kanyangarara's deposition on February 20, 2023, and counsel for Ms. Kanyangarara deposed Ms. Schucker and Ms. Coughenour on February 24, 2023.

Based on statements elicited during Ms. Shucker and Ms. Coughenour's depositions, Ms. Kanyangarara believed SxS and its employees didn't properly preserve certain texts, emails, and other relevant, contemporaneous documents. Ms. Kanyangarara demanded production of those documents and threatened to file a spoliation motion. Defendants conducted additional searches and produced additional documents on March 7, 2023, and April 13, 2023. Additionally, Defendants produced an employee chart prepared by Melanie White, SxS's current Human Resources Manager, and offered to make her available for questioning. In lieu of following up on those productions or deposing Ms. White, Ms. Kanyangarara filed a spoliation motion.

Defendants filed a Motion For Summary Judgment on April 26, 2023. The same day, Ms. Kanyangarara filed a Motion For Sanctions Seeking An Adverse Inference For Spoliation Of Evidence.

8

## II.     SUMMARY JUDGMENT

### A.     Legal Standard

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter,

summary judgment "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment,

after adequate time for discovery and upon motion, against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986) (quotations omitted). In ruling on a summary judgment motion,

a court must "view the facts and draw reasonable inferences in the light most favorable

to the party opposing the [summary judgment] motion." *Scott v. Harris*, 550 U.S. 372, 378

(2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the

allegations in the moving party's pleadings; instead he must show where in the record

there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d

252, 256 (3d Cir. 2007) (citation omitted).

### B.     FMLA

Under the FMLA, an "eligible employee" is entitled to "a total of 12 workweeks of

leave during any 12-month period for . . . a serious health condition that makes the

employee unable to perform the functions of the position of such employee." 29 U.S.C. §

2612(a)(1)(D). It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" that the FMLA provides. 29 U.S.C. § 2615(a)(1). Department of Labor regulations prohibit employers "from discriminating or retaliating against an employee . . . for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c).

### 1.    FMLA interference

To prevail on a claim of FMLA interference, Ms. Kanyangarara must prove that (1) she was an eligible employee under the FMLA; (2) SxS was subject to the FMLA's requirements; (3) she was entitled to FMLA leave; (4) she gave notice to SxS of her intention to take FMLA leave; and (5) SxS denied her benefits to which she was entitled under the FMLA. *See Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 155 (3d Cir. 2017). To satisfy the third element, Ms. Kanyangarara must show she suffered a serious health condition, which the Act defines as "an illness, injury, impairment, or physical or mental condition that involves inpatient care . . . or continuing treatment by a health care provider." 29 U.S.C. § 2611(11). To satisfy the notice element, Ms. Kanyangarara must show she conveyed "reasonably adequate information under the circumstances to understand" that she may need FMLA leave. *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2007).

Even after resolving factual disputes in Ms. Kanyangarara's favor, she hasn't shown that she suffered from a serious health condition. She was not in inpatient care, nor was

she subject to continuing treatment. She took a COVID-19 test, and Tower Health recommended she work from home while she awaited results in case her test came back positive. She intended to continue working from home and doesn't suggest that she was unable to do so. At most, Ms. Kanyangarara suffered a sore throat when she took the test. I will assume that she told Ms. Schucker that she felt ill, but a sore throat doesn't qualify as a serious health condition under the FMLA. *See* 29 C.F.R. § 825.113(d). Because the undisputed facts show she didn't have a serious health condition, she wasn't entitled to FMLA leave.

Even if Ms. Kanyangarara was entitled to FMLA leave, she didn't notify SxS of her intent to take it. As part of my resolution of factual disputes in Ms. Kanyangarara's favor, I will assume she told SxS that she intended to work from home. But the key point there is the message: she intended to ***work***. That's different from an intent to take FMLA leave, which involves not working. Given that all she told SxS was that she took a COVID-19 test, had a sore throat, and intended to work from home, there's no reasonable interpretation that what Ms. Kanyangarara conveyed about her health condition put SxS on notice of her intent to take FMLA leave.

Ms. Kanyangarara argues that SxS had to allow her an opportunity to cure her FMLA request to allege a serious health condition. That's not what the cases say, though. *First*, an employer only has to permit a cure of a request if the employee has asserted an inability to work due to a health condition. *See Hansler v. Lehigh Valley Hosp. Network*,

798 F.3d 149, 151-52, 158 (3d Cir. 2015); *see also Payne v. Woods Services, Inc.*, 520 F. Supp. 3d 670, 671 (E.D. Pa. 2021). Ms. Kanyangarara never asserted she was unable to work, nor did she invoke the kinds of circumstances that the employees in *Hansler* and *Payne* raised with their respective employers.

*Second*, Ms. Kanyangarara cites *Sarnowski* to argue she was entitled to an opportunity to cure her request so long as she provided enough information to show she "may need FMLA."[3] But *Sarnowski* wasn't talking about curing defects to allege a serious health condition. It was about the standard for whether an employee provided notice. I've already found that there's no reasonable interpretation of the facts under which Ms. Kanyangarara notified SxS of a need to take FMLA leave. So there was no obligation to point Ms. Kanyangarara to the necessary forms or provide her an opportunity to get a medical certification or cure her request.

### 2.      FMLA retaliation

"To prevail on a retaliation claim under the FMLA, the plaintiff must prove that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301-02 (3d Cir. 2012). I've already found that Ms. Kanyangarara didn't have a serious health condition, so she didn't

---

[3] Ms. Kanyangarara erroneously quotes *Payne*, 520 F. Supp.3d at 675 for this standard. (ECF No. 24 at 5.) That quote isn't found in *Payne*, but in *Sarnowski. See Sarnowski*, 510 F.3d at 403 (quoting *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005).

qualify for the FMLA. In addition, she didn't provide SxS with notice of her intent to take FMLA-qualifying leave, so she can't satisfy the first element of an FMLA retaliation claim.

Even if she'd invoked her rights, Ms. Kanyangarara can't show the causation element. At her deposition, Ms. Kanyangarara said she believes management retaliated against her because she took residents to receive COVID-19 tests, not because she asked for FMLA leave. (*See* ECF No. 21-2 at 211:16-212:9, 222:7-20.) That's different from the conduct that the FMLA protects, and it's another reason that her FMLA retaliation claim fails.

### C. FFCRA

Congress Passed the Families First Coronavirus Response Act in March 2020 to guarantee sick and emergency leave to employees who couldn't work due to the pandemic. *See* Pub. L. No. 116-127, 134 Stat. 179 (Mar. 18, 2020) ("FFCRA"). One of the law's two main sections, the Emergency Paid Sick Leave Act ("EPSLA"), mandates employers "shall provide to each employee . . . paid sick time to the extent that the employee is unable to work (or telework) due to a need for leave because . . . the employee has been advised by a health care provider to self-quarantine due to concerns related to COVID-19." FFCRA § 5102(a)(2).[4] Ms. Kanyangarara says the Defendants violated EPSLA

---

[4] The second of the Act's main sections, the Emergency Family Medical Leave Expansion Act ("EFMLEA"), doesn't apply to employees who seek leave due to their own illness. *See Huff*, 2023 WL 4139022 at *10. Although she doesn't specify it in her Complaint, Ms. Kanyangarara can only assert a claim under EPSLA, so I won't address EFMLEA.

by denying her the ability to work from home despite the Tower Health form's recommendation.

This claim's fatal flaw is that EPSLA only applies to private employers with "fewer than 500 employees." FFCRA § 5110(2)(B)(i)(I)(aa). SxS produced evidence that it employs over 1000 employees. Therefore, the FFCRA doesn't apply to it, and Ms. Kanyangarara can't assert this claim.

Both of Ms. Kanyangarara's arguments for why I should ignore this fact are unpersuasive. *First*, it doesn't matter that SxS failed to raise its employee count as an affirmative defense, because it's not one. The law defines a covered employer, and SxS doesn't fit that definition. By its terms, the law doesn't apply to SxS, and an employer does not expand the scope of the law's coverage by failing to plead the number of employees as an affirmative defense. Instead, proof of the statute's applicability, including the number of employees, falls on the employee seeking to invoke the statute.

*Second*, there's not enough prejudice to Ms. Kanyangarara from the late disclosure to require that I ignore the undisputed fact that the FFCRA doesn't apply. It's true that Defendants should have amended their initial disclosures once it was clear that Ms. White's testimony about SxS's employee headcount was relevant to one of Ms. Kanyangarara's claims. But SxS offered to make Ms. White available for a deposition even after the close of discovery. That deposition would have cured any prejudice. Ms. Kanyangarara opted not to take that deposition, but she can't decline the chance to

depose someone with relevant information and then ask that I disregard that information. She should have taken Ms. White's deposition.

### D.    Title VII, Section 1981, And The PHRA

The substantive elements of Section 1981 and Title VII discrimination claims are "generally identical." *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009). The same is true for the PHRA. *See Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 150 n.1 (3d Cir. 2017). Therefore, I'll conduct my analysis of those claims concurrently.

### 1.    Discrimination

Because Ms. Kanyangarara hasn't alleged any direct evidence of discrimination, I analyze her claims under the familiar three-step framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, she must establish a *prima facie* case of discrimination. *See Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 n.11 (3d Cir. 2004). Then, SxS has a burden of production (but not persuasion) to articulate a legitimate, nondiscriminatory reason for its adverse employment decision. *See id.* If it does so, then Ms. Kanyangarara must proffer evidence to allow a reasonable factfinder to find, by a preponderance of the evidence, that the employer's proffered reasons are false or pretextual. *See Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003) (*per curiam*).

Ms. Kanyangarara can't establish a *prima facie* case of racial discrimination. To do so, the claimant must demonstrate, by a preponderance of the evidence, that (a) she is a member of a protected class, (b) she was qualified for the position she held, (c) she

suffered an adverse employment action, and (d) similarly situated persons who are not members of the protected class were treated more favorably, or that the circumstances of her termination give rise to an inference of discrimination. *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410–11 (3d Cir. 1999); *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 327 (3d Cir. 2015). The Defendants admit Ms. Kanyangarara satisfies the first two elements, and there's a dispute of material fact as to whether she was fired or resigned, so I will construe that fact in her favor and assume she suffered an adverse employment action. However, the undisputed facts don't give rise to an inference of discrimination.

There are two reasons Ms. Kanyangarara can't satisfy the final element of a *prima facie* case. *First*, she offers no meaningful comparators. Although she claims she was treated worse than White employees, she admitted multiple times at her deposition that she had no knowledge of her coworkers' workloads or discipline they received. She also didn't depose those coworkers or produce any documents that suggest that SxS treated them differently from her. On the only occasion she says she received a formal disciplinary action, she admits that her White colleagues did as well.

*Second*, nothing about the circumstances surrounding Ms. Kanyangarara's separation from employment suggests race played a factor. The conversations leading up to Ms. Kanyangarara's phone call with Ms. Schucker were about COVID-19 tests, COVID-19 policies, work from home, and Ms. Kanyangarara's attempts to cover for staff illnesses. Before that, Ms. Kanyangarara can't point to any instance of racial discrimination other

16

than a general atmosphere that she says she felt or perceived to be discrimination. But "[f]acts, not feelings, are required" to withstand summary judgment. *Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133, 1137 (7th Cir. 1997); *see also Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 666 (3d Cir. 2016). Ms. Kanyangarara presents no facts suggesting an inference of discrimination, so her discrimination claims fail.

### 2.      Retaliation

Title VII prohibits an employer from retaliating against an employee for complaining about discrimination. 42 U.S.C. § 2000e–3(a). "To state a prima facie case of retaliation, a plaintiff must show that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the participation in the protected activity and the adverse action." *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 256 (3d Cir. 2017). A plaintiff may prove her case with indirect evidence through application of the *McDonnell-Douglas* burden-shifting framework. *See id.* Under that framework, once the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to provide a non-retaliatory justification for its actions, after which the plaintiff must show that the justification is pretextual. *See id.*

The only alleged activity protected under Title VII is Ms. Kanyangarara's 2019 complaint that Ms. Ruyak made disparaging comments about African Americans. At her deposition, Ms. Kanyangarara admitted that that complaint had nothing to do with any

retaliation against her. (*See* ECF No. 21-2 at 212:10-20.) And, in any event, the temporal distance between that complaint and her termination undermines any suggestion that her protected conduct led to her termination.

### 3.    Hostile work environment

Ms. Kanyangarara's claim that she suffered a hostile work environment due to race-based discrimination can't survive for similar reasons. To prevail, she'd have to show (a) she suffered intentional discrimination because of her race, (b) the discrimination was severe or pervasive, (c) the discrimination detrimentally affected her, (d) it would have detrimentally affected a reasonable person in like circumstances, and (e) the existence of *respondeat superior* liability. *See Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017). As I've already noted, Ms. Kanyangarara fails to satisfy the firt element because she hasn't put forward any evidence suggesting she suffered from intentional racial discrimination. Her perceptions and feelings alone aren't enough.

There are two additional reasons Ms. Kanyangarara's hostile work environment claim fails. *First*, Ms. Kanyangarara doesn't allege any instance of racial harassment that is so severe, or a pattern that is so pervasive, as to satisfy the second element of the *prima facie* case. This relates to the second reason: a reasonable person in like circumstances wouldn't be detrimentally affected by the types of behaviors that Ms. Kanyangarara describes. Even Ms. Kanyangarara admits that, at the time, she didn't think she was a victim of racial discrimination. Only towards the end of her tenure at SxS did she start to

think she experienced racial discrimination and harassment. But at that point, the conduct had nothing to do with her race. Therefore, she hasn't shown the type of conduct necessary to satisfy the standard for a hostile work environment claim.

### 4.   Individual PHRA claims

Ms. Kanyangarara asserts individual claims against Ms. Schucker and Ms. Coughenour for aiding and abetting discrimination. The PHRA makes it unlawful for individual managers "to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice." 43 P.S. § 955(e). By its terms, the law requires proving a predicate unlawful discriminatory practice. That's why courts in this District dismiss or grant summary judgment on aiding and abetting claims under § 955(e) when no underlying discrimination claim survives. *See, e.g.*, *Lombard v. Lassip, Inc.*, 2:17-cv-0964, 2017 WL 6367956 At *5 (E.D. Pa. Dec. 13, 2017); *Dickinson v. Millersville Univ. of Pa.*, 2:13-cv-5022, 2014 WL 1327610 at *5 (E.D. Pa. Apr. 3, 2014); *Eldeeb v. Allied Barton Sec. Servs. L.L.C.*, 2:07-cv-0669, 2008 WL 4083540 at *11 (E.D. Pa. Aug. 28, 2008), *aff'd*, 393 Fed. App'x 877, 881 (3d Cir. 2010). I agree with the rationale of those decisions. Therefore, because none of Ms. Kanyangarara's discrimination claims survives, I'll grant summary judgment on the aiding and abetting claim against Ms. Schucker and Ms. Coughenour.

### E.   Supplemental Jurisdiction

Ms. Kanyangarara's only remaining claims are state law claims. When all claims over which this Court has original jurisdiction are dismissed, this Court "<u>must</u> decline" to

exercise supplemental jurisdiction over pendent state claims "unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (emphasis in original). This case has no such considerations. Certainly, the case has been in this Court for a while, and it's well developed, but that's true of every case with pendant state law claims. Therefore, I won't reach Ms. Kanyangarara's wrongful termination and Pennsylvania Wage Payment And Collection Law claims, but I'll dismiss them without prejudice so she may re-file them in the appropriate Pennsylvania state court.

## III.    SPOLIATION

### A.    Legal Standard

Spoliation is the destruction or alteration of evidence, or the failure to preserve evidence, when litigation is pending or reasonably foreseeable. *See Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012) (citations omitted). It occurs when (1) the evidence was in the party's control, (2) it was relevant to a party's claims or defenses, (3) there was actual suppression or withholding of evidence, and (4) the duty to preserve the evidence was reasonably foreseeable. *See id.* "[A] finding of bad faith is pivotal to a spoliation determination" because "withholding requires intent." *Id.* at 79. To show "actual suppression or withholding," the moving party must "provide sufficient evidence demonstrating that the [evidence sought] actually existed." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 292 (3d Cir. 2018) (quotations omitted).

"An adverse negative inference is an extreme remedy" for spoliation. *McAdams v. United States*, 297 Fed. App'x 183, 187 (3d Cir. 2008). For ESI, it requires finding that the non-moving party "inten[ded] to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). When contemplating sanctions, courts must consider (1) the degree of fault of the spoliating party, (2) the degree of prejudice suffered by the other party, and (3) whether there's a lesser sanction that will avoid substantial unfairness and, where the spoliating party is seriously at fault, will deter such conduct by others in the future. *See GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76, 82 (3d Cir. 2019). "A dispositive sanction is warranted only where the non-responsible party's case is severely impaired because it lacked the information that was not produced." *Id.* (quotes omitted).

**B.    Analysis**

Even though Ms. Kanyangarara can't succeed on the merits, her spoliation motion is not moot because I have the power to police discovery conduct in cases before me. That said, the motion fails for three reasons: (1) she has not demonstrated bad faith on Defendants' part; (2) she has not shown that she suffered prejudice; and (3) given my summary judgment ruling, there's no basis for me to impose a negative inference, which is the only relief that Ms. Kanyangarara has requested.

**1.    Bad faith**

Ms. Kanyangarara hasn't shown that Defendants engaged in bad faith conduct or had the requisite intent necessary to prove spoliation. In fact, several facts in the record

indicate a good faith effort to comply with Ms. Kanyangarara's requests for production. *First*, Defendants conducted a reasonable search for responsive documents and produced hundreds of pages of material in December 2022. Ms. Kanyangarara didn't object or indicate the production was lacking until after the close of discovery, even though she knew about the disputed text message before she received any discovery. When Ms. Kanyangarara asked for more documents in March 2023, Defendants conducted more searches and produced more material. On these facts, there's no indication that Defendants intended to withhold documents or deprive Ms. Kanyangarara of evidence.

*Second*, Ms. Kanyangarara hasn't shown that Ms. Schucker intentionally distorted or deleted text messages or that anyone told her to do so. At most, Ms. Schucker said she didn't remember why she cropped the screenshots of responsive text messages that she submitted but that she was probably told she included enough detail. Ms. Schucker also testified that she didn't delete any texts, emails, or other documents, so she couldn't intend to deprive Ms. Kanyangarara of their use in the litigation.

*Third*, the only missing document that Ms. Kanyangarara identifies is the text message with a picture of the Tower Health form instructing her to work from home while she awaited her COVID-19 test results. Ms. Kanyangarara knew of the existence of the message and had the entire discovery period to demand its production. Only after the bell rang to end discovery did Ms. Kanyangarara try to retrieve this text. That timing eliminates any suggestion that it was intentionally destroyed or withheld.

Ms. Kanyangarara also claims that Defendants destroyed or withheld Ms. Coughenour's contemporaneous notes and files, but there's no proof they existed in the first place. Ms. Coughenour testified she didn't destroy any documents or files and that any document or file related to Ms. Kanyangarara that was in her possession was in her office. Ms. Coughenour also testified that she didn't know if she had taken notes about Ms. Kanyangarara related to calls with subordinates such as Ms. Schucker. That's not evidence that Defendants withheld those notes, nor is it evidence that those notes existed. There's no evidence that Defendants withheld those files, let alone that they did so in bad faith. To the extent they weren't produced right away, SxS produced them once Ms. Kanyangarara followed up on its discovery requests. That's how discovery should work.

### 2.    Prejudice

Ms. Kanyangarara has not shown that she suffered any prejudice as a result of any document that Defendants withheld or destroyed. For purposes of summary judgment, I gave her the benefit of all inferences, including the inferences that she might have established with additional documents, and she still came up short. Defendants also made supplemental productions and offered to make additional witnesses available for deposition. Ms. Kanyangarara did not take advantage of those offers. Nor did she move to compel, to reopen discovery, or to take additional depositions about Defendants' document preservation and retrieval efforts. Her actions speak louder than her words and tell me that she didn't suffer the kind of prejudice that she claims.

### 3.    Negative inference

Ms. Kanyangarara's only request for a sanction is an adverse inference, but there's no inference for me to enter given my summary judgment ruling. Nor would a negative inference have changed the outcome of my summary judgment decision because I have given Ms. Kanyangarara the benefit of all inferences for purposes of that ruling. The negative inference that she requests would not fill the evidentiary gaps in her case; it would only have cemented for trial the inferences that I have already drawn in her favor. Given my summary judgment ruling, and my conclusions about prejudice and bad faith, I have no occasion to impose a lesser sanction at this point, nor even a reason to think a lesser sanction is appropriate. But I do note that it is likely the case that a lesser sanction than a negative inference could have cured any prejudice in this case.

## IV.    CONCLUSION

It's easy for heated phone conversations to result in misinterpretation or petty disputes. But that doesn't mean the result violates federal laws. In discovery, Ms. Kanyangarara failed to adduce evidence sufficient to support her FMLA and discrimination claims. An appropriate Order follows.

BY THE COURT:

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

September 28, 2023